**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

FRATERNAL ORDER OF POLICE, et al.,          *

     Plaintiffs,          *

           v.          *          Civil Action No. AW-08-2455

PRINCE   GEORGE'S   COUNTY,          *
MARYLAND,
                                *

     Defendant.

                        ********

## MEMORANDUM OPINION

Various Prince George's County Unions, including, but not limited to, the Fraternal Order of Police Lodge No. 89 and the International Fire Fighters Association Prince George's County Local 1619, Inc., (the "Public Safety Unions") as well as  the American Federation of State and Municipal Employees ("AFSCME"), AFL-CIO and five affiliated AFSCME local Unions (the "AFSCME Unions") (collectively, the "Unions") bring this action against Prince George's County, Maryland, (the "County") for declaratory, injunctive and monetary relief as a result of the adoption and implementation of an Employee Furlough Plan ("EFP") proposed by the Prince George's County Executive, on September 15, 2008 and approved by the Prince George's County Council on September 16, 2008.  Currently pending and ripe for review is the County's Motion to Dismiss or in the alternative Motion for Summary Judgment as to the Public Safety Unions' Complaint (Paper No. 8), the Public Safety Unions' Cross Motion for Summary Judgment as to Count I of the Complaint (Paper No. 12), the Public Safety Unions' Cross Motion for Summary Judgment as to Count II and III of the Complaint (Paper No. 23), the County's Motion to Dismiss AFSCME's Intervening Complaint (Paper No. 27), and the AFSCME Unions' Cross Motion for Summary

-1-

Judgment (Paper No. 33).  The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the pending motions.  On February 13, 2009, the Court held a hearing on the pending motions.  *See* Local Rule 105.6 (D. Md. 2008.) For the reasons stated more fully below, the Court will grant in part and deny in part the County's motion for summary judgment and motion to dismiss the intervening complaint and grant in part and deny in part the Unions' cross motions for summary judgment.

## I.        Factual and Procedural Background

Just as it was for the rest of the country, the period of 1999 through 2005 was a time of exponential growth for Prince George's County, due in large part to a booming housing market.  In 2005, however, the County's housing market began to decline.   The decline was widespread and grew in scope well into 2008, and whether the market has bottomed out remains to be disputed.  The market decline was not unique to Prince George's County.  In fact, the entire state of Maryland, and virtually every state in the country, experienced a severe economic downturn as a result of a chain of events set into motion by a flailing housing market. As explained in greater detail below, this downturn led to a significant decrease in revenue for the County, which then caused a budget shortfall.   In response to the budget shortfall, the County furloughed approximately 5,900 employees.  This suit challenges the legality of the furlough,  in light of collective bargaining agreements between the County and the Plaintiffs.

### A.        FY 2009 Budget Process and Proposal

In late 2007 and early 2008, the Prince George's County Office of Management and Budget ("OMB") began to prepare its Fiscal Year 2009 ("FY 2009") budget.  As a part of the annual budget preparation process, and in accordance with the Prince George's County Code, the Spending and Affordability Committee ("SAC") reviewed the County's General Fund Revenue for FY 2009.  The

SAC issued a final report on January 1, 2008, documenting its findings and recommendations for FY 2009. (*See* Paper 33 Ex. B.)  The SAC informed the County Executive and the County Council that the County was "projected to experience an $80.1 million General Fund deficit," and if any of the additional risks and challenges facing the County occurred, such as "additional State cuts to local aid, . . . a recession, . . . [or] a delayed recovery of the housing market . . . the County revenue picture would be worse and the County General Fund deficit could be larger. . . " than the $80.1 million it projected.[1]  (*Id.*) The SAC also warned that the "County's General Fund revenue growth in FY 2008 and FY 2009 [was] projected to slow down significantly, even without factoring in the risks mentioned above" and the SAC characterized the County's revenue picture as "dim." (*Id.*) Moreover, the SAC emphatically cautioned the County that because "expenditures continue to grow faster than revenues," the "[t]otal General Fund expenditures in FY 2009 [were] projected to exceed revenues by $80.1 million, assuming compensation with normal growth in cost of living adjustments, merit increases [and] public safety new hiring in line with historical trends . . . ." (*Id.*) In conclusion, the SAC advised the County to place a "ceiling on total General Fund appropriations for FY 2009 at 2.626 billion . . . ." (*Id.*)

On February 28, 2008, in a letter to the County Executive and the County Council, Thommie Thompson, Prince George's County Director of the Department of Housing and Community Development, echoed the admonishments of the SAC.  (*See* Paper 33 Ex. C.) He reported on the rising foreclosure rates and the subprime mortgage crises facing Prince George's County. (*Id.*) In particular, he characterized the problem in Prince George's County as "alarming," in view of the fact that "Prince George's County had the State's highest number of foreclosure events . . . in the second quarter of 2007." (*Id.*)

---

[1] The SAC first projected a significant economic slow-down in revenue growth for FY 2007 and FY 2008, and attributed the slow-down to a "softening economy and weakening housing market." (Paper 33 Ex. G.)

On March 14, 2008, the County Executive submitted a Proposed Operating Budget ("POB") to the County Council totaling slightly over $2.67 billion.   In a narrative attached to the County Executive's POB, the County Executive stated that the proposed FY 2009 budget "represented an increase of 1.3% from the FY 2008 budget," and he also forecasted that the County's "General Fund revenue [would] slow down dramatically."  (Paper 8 Ex. 14.)   The County Executive averred that the "[i]n the past several months, sales of existing homes . . . decreased by over 50% and recovery [was] not anticipated in the immediate future,"[2] and that, "[a]ccording to the State Department of Legislative Services, the [C]ounty [was] expected to lose $53.3 million in FY 2009 revenues [from the State of Maryland],"[3] due to Maryland's projected $1.5 billion deficit. (*Id.*) All told, the County faced a $95 million deficit due to the economic slow-down. (*See id.*)   The County Executive then outlined the steps that were taken to address the deficit.

First, the County Executive required all agencies to submit two FY 2009 budgets.  One budget was a maintenance budget, and the other budget represented a 7% reduction from the maintenance level.  (*Id.*)  Second, in an effort to "more effectively align each agency's strategic priorities and core services with funding allocations," the County Executive "reemphasized the importance of 'Charter for Change,'" the County's performance management program.  (*Id.*)  The County Executive then stated that despite implementing these two measures, "the County still faced a budget gap, . . ." and advised that the County would "continue the hiring freeze for non-sworn positions, reduce debt service costs associated with a lower bond sale, and prudently use fund balance for one-time costs," in order to further address the shortfall. (*Id.*)  The County Executive pronounced that certain revenue increases were also assumed within the proposed FY 2009 budget.

---

[2] The County Executive derived these figures from a report generated by Metropolitan Regional Information Systems ("MRIS").

[3] The January 1, 2008, SAC report also forecast this loss of revenue.  (*See* Paper 33 Ex. B.)

The POB "assumed an increase in the [C]ounty's income tax rate from 3.1% to 3.2%," as well as "an increase in the [C]ounty Recordation Tax rate from $2.20 to $2.50 for each $500 on all instruments of writing subject to the tax." (*Id.*) All of the steps outlined by the County Executive allowed the County to close the budget gap.

The County Executive also addressed the "additional risks" raised by the SAC. He stated that, if State tax increases were not adopted or if funding decreased beyond what was already anticipated, to close the gap "a reduction of local aid [was] possible," and "it appear[ed] that further reductions to Community College and other County aid [were] possible." (*Id.*) In conclusion, the County Executive acknowledged the SAC's report and the fact that the POB was "$44.4 million higher than [the] SAC's recommendation," but urged the County Council to approve the proposed budget, and stated that "the budget represent[ed] the continued funding of the Administration's priorities . . . ." (*Id.*)

When the County Executive submitted the POB for FY 2009, he followed it up with a press release on March 18, 2009. (*See* Paper 33 Ex. A.) In the press release, the County Executive declared that although FY 2009 was a "very difficult budget year," due to the "slumping housing market, which resulted in a significant decrease in transfer and recordation taxes," and $53.3 million in lost funding from the state; he "had managed to overcome a $121.6 million budget deficit," and remained "committed to maintaining all public safety funding." (*Id.*) Two weeks later, on April 8, 2008, the AFSCME Unions entered into contract with the County.[4] (Paper 33 at 2.)

For reasons rooted in strategic and fiscal policies, as well as mandates by the Prince George's County Code, Prince George's County maintains "reserve funds." Prince George's County has three such reserve funds, a 5% General Fund Contingency Reserve ("GFCR"), a 2% General Fund

---

[4] The County contends that it reached an agreement with the AFSCME Unions on July 20, 2007, not April 2008, for FY 2008 and FY 2009. In April 2008, the County Council formalized the AFSCME Unions' contracts. (Paper 41 at 6.)

Operating Reserve ("GFOR"), and an Undesignated Fund Balance ("UFB").  The GFCR is required

by Section 806 of the County Charter, and may only be appropriated, in accordance with Section

816,  for "a public emergency, which constitutes a sudden, unexpected or unforeseen condition or

occurrence, creating an imminent hazard to life, health or property requiring an immediate action."

(Paper 8 Ex. 7.)  Although not required by the County Charter, the purpose of the GFOR is to

"ensure a reasonable degree of stability in its programs over the long run."  (Paper 48 Ex. 3.)  The

GFOR is a "continuing and non-lapsing source of unappropriated funds that can be used to offset

the impact of budget emergencies or as a funding source for expenditures that the County Executive

and County Council determine would benefit the citizens of Prince George's County."  (*Id.*)  The

UFB is an unrestricted fund and "exists due to the revenue surpluses from the housing market boom

in the past years, and is to be used to mitigate the impact of the declining housing market and the

accompanied dramatic slowdown of the revenue growth within the County."  (Paper 27 at 10.)  The

UFB may be appropriated at the County Executive's discretion, and every year a portion of the fund

balance, ordinarily about $27 million, is designated to balance the following  year's budget.[5]

(Seeman Depo. at 42.)

   B.      *County's Bond Rating*

   In early May, 2008, the County Executive and other County officials, including Jonathan R.

Seeman, Director of the OMB for Prince George's County, went to New York City to give a

presentation to the bond rating agencies.[6]  (*See* Seeman Depo. at 94.)  The County makes this

presentation annually to provide investors with the information necessary to guide their investment

---

 Mr. Seeman also added that the money in the UFB could be spent, "if the County were to choose to spend [it,] but as a matter of policy [the County] tries to retain the [UFB.]" (Seeman Depo. at 50)

[6] In three separate meetings, the County met with officials from Standard & Poor's, Fitch and Moody's. (*See* Seeman Depo. at 133.)

decisions.   In the power point presentation to the agencies, the County presented two charts that showed the history of the UFB.  (*See* Paper 48 Ex. 8.)  The first chart estimated that by the end of June, 2008, the County's UFB would total $35.8 million. (*See* Paper 48 Ex. 8.) During the presentation, the County officials also discussed the "current state of [the County's] affairs." (Seeman Depo. at 140.)  The County shared that it was "facing fiscal challenges." (*Id*. at 141.)  In particular, the County shared the following information with the rating agencies: (1)"the information [it] got back in January from the [SAC] indicated [sic] that primarily the housing market was declining"; (2) "that there were expenditures increases that were causing about a . . . $120 million gap," due to the decline in the housing market and cuts from the State"; (3) "that [the County's] revenue growth [was] not enough to provide for . . . eight to ten percent growth"; and (4) the future risks of foreclosure, and the potential for further deterioration. (*Id*. at 143-44.)

       In response to questions from the rating agencies about its ability to maintain its reserves, the County unequivocally told the rating agencies, that it was "willing to take strong action to reduce expenditures . . . includ[ing] things like furloughs."  (*Id*. at 145-146.) The County told the rating agencies that it "[was] going to keep [its] budget in balance," and according to the County, the rating agencies "believed [them,]" because on June 3, 2008, Standard & Poor's issued a AAA bond rating for the County.[7]  (*Id*. at 145.)

       The County issued a press release announcing that for the "first time in County history," it achieved an historic AAA bond rating and that its "presentation to the Wall Street rating agencies three weeks ago [showed the rating agencies] the county's financial processes, [its] commitment to strong financial leadership, and [its] ability to maintain growth and prosperity during tough economic times."  (Paper 12 Bartholomew Aff. Ex. A.)  The County proclaimed that this "'rating

---

[7]  This is Standard & Poor's highest rating.  Only 1% of counties in the nation have a AAA bond rating.  (Paper 12 Bartholomew Aff. Ex. A.)   Fitch gave the County an AA+ rating, and Moody's gave the County an Aa1 rating.

upgrade to AAA reflects the continued strength of the county's financial position through various economic cycles, generating consistent surpluses which have contributed to very strong reserve levels . . . .'" (*Id.*)  According to the County, its ability to "[maintain] its reserves," its strong financial management, and its readiness to reduce expenditures is the "primary reason" it "got the rating."[8]  (Seeman Depo. at 107,145-46)  The County's new rating applied to the $110 million in general obligation bonds that the County issued the same week. (Paper 12 Bartholomew Aff. Ex. A.)  In its official statement for the bonds,[9] the County estimated that the UFB would total $70 million as of the end of June, 2008.[10]  (*Id.*)

On May 28, 2008, one week before the bond rating was issued, the County Council enacted the POB without any substantive changes.  Around the same time, the Public Safety Unions' collective bargaining agreements ("CBAs") covering the two-year period from July 1, 2007 through June 30, 2009, were fully and finally approved by the County Council.[11]  (Paper 12 at 5.)  The AFSCME Unions' CBAs were proposed on February 25, 2008 and ratified by the County Council on March 18, 2008.

C.      *FY 2009 Budget Shortfall and Revisions*

While the POB was before the County Council, the OMB did not revise the County's

---

[8]  Before the County received the AAA bond rating, it had a AA bond rating.  The difference between a AA and a AAA rating "over a period of time would have been multiple millions of dollars."  (Seeman Depo. at 108.)

[9]  An official statement is a document or documents prepared by a state, municipality or governmental agency that discloses material information in connection with municipal bonds and/or securities.  Typically, official statements include information regarding the purpose of the bonds or securities, how the securities will be repaid and the financial health of the state, municipality or governmental agency issuing the securities.  Investors use this information to evaluate the credit quality of the securities. (*See* Paper 48 Ex. 1 at 134-37.)

[10]  When asked to explain the difference in the UFB total as of the end of June  2008 given to the rating agencies, versus that which was presented in the official statement, Mr. Seeman stated, "it's for a different audience.  [One figure] is to sell the bonds, [the other] is to present to the rating agency . . . ."  (Seeman Depo. at 98.)  Mr. Seeman stated that the numbers were based on the same data.  (*Id.* at 97.)

[11]  The Prince George's County Correctional Officers' CBA was approved in October 2008.

revenue estimates, but after the Council enacted the budget, the OMB "reprojected" the revenues. (*See* Seeman Depo. at 99.)   The new projections were "dramatically worse than what was in the proposed budget." (*Id*.)   On June 26, 2008, the County called Plaintiffs and their principal representatives to a special meeting and announced that the County was facing a shortfall in expected revenue.   To cover that shortfall, the County requested that each labor organization give up their merit step increases or cost-of-living adjustments ("COLAS"), as of July 1, 2008, the start of FY 2009.

At the June 26, 2008, meeting, the County presented a document to the Unions entitled, "FY 2009 Budget & Revenue Revisions." (Paper 48 Ex. 4.)   In the document, the County projected that by the end of June, 2008, i.e. four days later, the UFB would total approximately $16 million, and that the FY 2009 budget, as a whole, would be negative $48 million.   (*Id*.)   As a result, Mr. Seeman recommended a "range of actions that the County took to attempt to resolve [its] budget shortfall."[12] (Seeman Depo. at 9-10.)

In a revised budget action plan, Mr. Seeman presented "a list of both cost savings and revenue measures."   (*Id*. at 11.)   In particular, the OMB proposed "a range of things . . ." such as "$13 million in compensation savings [by eliminating the Unions' COLAS,] a reduction to the Board of Education [totaling] $14 million, deferral of hiring of public safety, police classes and a reduction in overtime."   (*Id*.)   When asked if these were the only options explored, Mr. Seeman explained that, "he could not recall if there were any other options [but that the County] focused on the two biggest areas of the budget which [were] employee compensation and the Board of Education . . . because that's where the money is." (*Id*. at 12.)   He further stated beyond the options cited above, "no other options were presented to the County Executive."   (*Id*. at 14.)   When asked

---

[12] The deposition of Jonathan R. Seeman was taken on March 17, 2009.

whether OMB considered cutting any funding to Prince George's Community College, Mr Seeman said that it was considered but a decision was made not to because the community college has been underfunded for years.  (*Id*. at 17.)  When asked about any cuts to Prince George's County Hospital, Mr. Seeman recalled that it was discussed but ruled out because [the County] is "bound by an agreement with the State . . . and [the County has] to pay that so while [they] talked about it [they] really [did not] have any way to do that."  (*Id*.)

When asked whether he considered increasing the revenue the County obtained from the Parks and Planning Commission, Mr. Seeman stated that the FY 2009 revised budget action plan included an additional $2 million in reimbursements from the Parks and Planning Commission.  Mr. Seeman explained that he did not seek any more than that, because prior to revising the FY 2009 budget, the County had already increased the Parks and Planning reimbursement to the County from $2 million to $8 million.  (*Id*. at 22-23.)  Thus, given this increase, "there was no consideration of going beyond [the additional $2 million]."  (*Id*. at 23.) Besides, Mr. Seeman added, "we can't take money from Parks and Planning unless they agree to it.  So my discussion with [the Budget Director for Parks and Planning] was, okay, can we agree on $2 million."  (*Id*. at 28) As of June 2008, the Commission had a fund balance of between $60-$80 million from excess property taxes paid in previous years.  (*Id*. at 29, 31.)  Mr. Seeman remarked that the fund balance was "one-time money," because it should not be used for ongoing expenditures.  (*Id*. at 29.) Mr. Seeman expressed that "there were no other alternatives that were considered that would have achieved anywhere near the savings that [the County] would have needed."[13]  (*Id*. at 45-46.)  He added that, "the only other alternative to the furlough would have been to lay off people."  (*Id*.)

---

[13] In the County's budget, $5 million was set aside for real estate purchases and another $3 million for equipment purchases. These monies were not obligated to be paid under a contract but rather were budget commitments.  (Seeman Depo. at 47-48.)

During the June 26, 2008 meeting, Mr. Seeman also represented that even without any reductions in pay from the negotiated contracts,  the County would still have more than 7% of its General Fund expenditures in reserved funds.[14]  (*Id*.)  Therefore, the Public Safety Unions took the position that the County was not facing a deficit because the County had more than enough money in its reserves to cover the pay increases included in the finalized CBAs.  (*Id*.)  The Unions also identified specific items in the County's budget that could be reduced or eliminated in lieu of cutting the pay increases.[15]  (Paper 12 at 9.)  In short, the Unions  made clear that the renegotiation of contractual wage increases was not possible unless and until the County could demonstrate that there were no reasonable alternatives.  (*Id*. at 9-10.)  On June 27, 2008, Jacqueline Brown, the County's Chief Administrative Officer, wrote the Unions to request "a reopener of the FY'09 Negotiation [sic] Agreements regarding COLA."[16]  (Paper 33 Ex. L.)

D.    *Budget Amendment*

On July 1, 2008, the County Executive amended certain revenue estimates and appropriations in the FY 2009 budget, in light of the decline in anticipated revenues.[17]  (Paper 8 Ex. 16.)  On July 8, 2008, the County and the Unions met again to discuss the County's fiscal issues and ways to close the budget deficit, however no agreement was reached.  (Paper 8 Ex. 17.)   On July 14, 2008, the AFSCME Unions wrote the County Executive to decline his administration's invitation to "re-open" the AFSCME CBAs to reduce employee compensation.  (Paper 22 at 12.) They wrote:

---

[14] Section 806 of the County Charter requires the County to maintain an equivalent of 5% of the County's budget in a "General Fund Contingency Reserve."

[15] Some of the items suggested were: (1) eliminate the millions of dollars in one-time grants issued by the County; (2) reduce the size or number of private contractors paid by the County; (3) furlough or reduce in-force non-public emergency safety employees; and (4) reduce or delay additional hiring.

[16] In its request for reopeners the County proposed to "rescind the July 1, 2008, two and one half percent cost of living." (Paper 33 Ex. L.)

[17] The Amendment was County Bill 51-2008.

> our considered opinion is that the revenue decline that you now
> predict is neither new in its origin nor unexpected.  The revenue
> trends recently noted are the same as those that were known to all
> when our local unions were last at the bargaining table with you.
> They consist of facts and figures that we and you had available before
> our FY [2009] contracts were closed, signed and ratified.

(Paper 22 at 12.)  Shortly thereafter, the County agreed to provide the Public Safety Unions all their

negotiated wage increases, and the County Council took their summer recess.  Upon their return, the

amendment was adopted on August 11, 2008.

E.      *Employee Furlough Plan*

On September 5, 2008, the County again revised its revenue estimates.  The new estimates

reflected an even greater shortfall of $57 million, $9 million more than the $48 million projected in

June.  (Paper 8 at 8.)  The UFB, however, totaled $65 million.  (Seeman Depo. at 100.)  On

September 15, 2008, the County Executive called another meeting with the Unions and their

principal representatives.  At this meeting, the County Executive shared the new revenue estimates

with the Unions.  The County Executive determined that, "based on the OMB and SAC projections,

and in light of the current economic climate, the County's financial stability [was] considered quite

volatile," and therefore "it was necessary to implement a furlough plan to reduce expenditures as

a preferred and less drastic alternative to RIFS or layoffs to balance the FY09 Budget."  (Paper 8

at 12-13.)  As authority for the furlough, the County Executive cited Section 16-229 of the County

Personnel Law.  On September 16, 2008, the Prince George's County Council approved CR-81-

2008, the Employee Furlough Plan ("EFP"), as proposed by the County Executive on September 15,

2008.[18]  A letter from the County Executive, addressed to all County employees, accompanied the

EFP on September 15, 2008.  The letter stated that "it was important to meet the budget shortfall

---

[18] The EFP required that approximately 5,900 employees give up to eighty (80) hours of pay in FY 2009.  The Public Safety Unions represent a little more than half of the 5,900 employees affected by the EFP.  It is unclear how many additional individuals are represented by the AFSCME Unions.  (Paper 12 n. 2.)

because it is essential to retain the County's AAA bond rating, which is part of the County's financial integrity." (Paper 12 at 12.) The EFP reduced the salaries of all County employees by a cumulative total of $20 million in FY 2009.[19] (Paper 12 at 2.)   The EFP cut the work hours of all covered employees[20] by eighty (80) hours during FY 2009, effectively cutting the annual salaries of all covered employees by 3.85%. (*Id.*)

During his deposition, with regard to the EFP, Mr. Seeman remarked that, when the decision was made to furlough,

> It was an alternative to eliminating COLAS. That's what the alternative was. The budget was amended to reduce compensation because that's what we decided to do. The alternative was reduce [the Unions] compensation . . . and [the Unions] didn't want to do it and that's why there was a furlough. Had the employees agreed to give up their COLAS, we would not be sitting here today. I hope everybody understands that. There would not have been a furlough had the employees given up their COLAS.

(Seeman Depo. at 53-54.)

When asked why the undesignated fund balance was not used to address the budget shortfall, Mr. Seeman stated that it is the County's "policy . . . not to use fund balance to pay for ongoing expenditures . . . unless you absolutely have to because it goes away." (*Id.*) He further elaborated, "we've never chosen to do that, it's not financially responsible." (*Id.* at 44.)

As of September 2008, when the EFP was enacted, the three funds totaled approximately $230 million. The GFCR totaled approximately $133 million, the GFOR totaled approximately $53 million, and the UFB totaled approximately $44 million. (Paper 8 Ex. 18.)

On September 18, 2008, the Plaintiffs filed this lawsuit in the Circuit Court for Prince

---

[19] This figure includes a reduction of more than $10 million from public-safety employees represented by the plaintiffs in this suit.

[20] The County Executive and members of the County Council were not subject to the EFP. (Paper 12 at 11.)

George's County, alleging two violations of the County's Personnel Law (Sections 16-233 and

16-229), as well as a violation of the Contract Clause of the United States Constitution.  U.S. Const.

art. I, §10, cl. 1.  The County removed the action to this Court on September 19, 2008.

## II.      Standard of Review

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is

to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231,

243 (4th Cir. 1999).  Except in certain specified cases, a plaintiff's complaint need only satisfy the

"simplified pleading standard" of Rule 8(a),  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513

(2002), which requires a "short and plain statement of the claim showing that the pleader is entitled

to relief."  Fed. R. Civ. Pro. 8(a)(2).  Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather

than a blanket assertion, of entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955,

1965 n.3 (2007).  That showing must consist of at least "enough facts to state a claim to relief that

is plausible on its face."  *Id.* at 1974.

In its determination, the Court must consider all well-pled allegations in a complaint as true,

*Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light

most favorable to the plaintiff.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776,

783 (4th Cir. 1999).  The court need not, however, accept unsupported legal allegations, *Revene v.*

*Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual

allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid

of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.

1979).  In sum, "[f]actual allegations must be enough to raise a right to relief above the speculative

level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."

*Twombly*, 127 S. Ct. at 1965 (internal citations omitted). Where a motion for dismissal pursuant to

Rule 12(b)(6) relies on matters outside the pleadings, the Court treats it as a motion for summary

-14-

judgment.  Fed. R. Civ. P. 12(d).

The County's motion is styled as a Motion to Dismiss or in the alternative a Motion for Summary Judgment.  In support of its motion, the Defendant filed several exhibits.  The Court will consider these exhibits and therefore, treat the motion as one for summary judgment.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *Runnebaum v. Nationsbank of Md., N.A.*, 123 F.3d 156, 164 (4th Cir. 1997) (citing *Anderson*, 477 U.S. at 255; *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).  To defeat such a motion, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him or her.  *Anderson*, 477 U.S. at 252; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (citations omitted).

To determine whether genuine and material factual disputes exist, the Court reviews the parties' respective memoranda and the many exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  When parties file cross motions for summary judgment, the court must view each motion in the light most favorable to the non-movant.  *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

**III.    Analysis**

*A.        Whether the EFP violates Section 16-233 of the County Personnel Law*

In essence, Count I of the Public Safety Unions' complaint and Count II of the AFSCME

Unions' complaint alleges that the by virtue of Section 16-233(e) of the Personnel Law, the

provisions of the CBAs that set the wages and hours preempt any contrary provision of the personnel

law.[21]    The Unions argue that the EFP, as enacted under Section 16-229 of the personnel law, is a

"contrary provision" and thus violates Section 16-233(e) of the Personnel Law, and therefore is

invalid.    Section 16-233(e) of the Personnel Law states,

> All collective bargaining agreements shall be adopted and approved
> by legislative acts of the County Council referencing the collective
> bargaining agreement and date of execution by the County Executive.
> Upon adoption of the legislative act by the County Council, any
> provision in the applicable agreement contrary to the provisions of
> this Subtitle shall have the effect of amending any such provision and
> enacting the provision into law applicable to that collective
> bargaining agreement.

(Paper 8 Ex. 24.)

The Unions maintain that subsection (e) is unequivocal, and therefore once a CBA receives

the County's legislative approval, the County is prohibited from adopting and implementing an EFP

without violating Section 16-233.  With this in mind, the Unions then point to Section 13A-109(g)

of the Labor Code that provides that, "if upon approval of the County Council, there is a conflict

between the collective bargaining agreement and any rule or regulation adopted by the employer,

including merit system or other personnel regulation, the terms of such agreement shall prevail,

except where specifically precluded by Charter or State law."  (Paper 8 Ex. 8.) Thus, the Unions

argue that because these statutes give the County Council the authority to approve CBAs that

---

[21] In their motion for summary judgment (Paper 33.), the AFSCME Unions expressly adopted the arguments raised by
the Public Safety Unions with regard to the County's Personnel Law.

conflict with pre-existing provisions of the personnel law, any provisions in CBAs that "might otherwise conflict with prior legislative acts contained in the Personnel Law are permitted to — and in fact must be interpreted to — supersede such legislation."   (*See* Paper 12 at 15.)

In response, the County advances two arguments, only one of which has any real merit. First, it argues that the majority of the CBAs in question do not guarantee any specific yearly dollar amount in salary for any employee, and therefore the EFP is not a "contrary provision."  This argument is without merit for several obvious reasons. Central to all CBAs are contractually guaranteed salary levels.  While overtime, merit increases and other fluctuating factors may not permit an employee to calculate his annual salary to the penny, the CBA does give the employee a solid expectation of the money he will earn for the year, and the employee, in turn, relies upon this expectation.

Second, the County asserts that it did not violate Section 16-233(e) because "none of the collective bargaining agreements contain any provisions exempting union employees from a furlough plan or otherwise negating [sic] the applicability of Section 16-229 of the Personnel Law. (Paper 8 at 15.)  The County highlights Section 16-101(b)(2)(F) of the Personnel Law and argues that the Unions have conveniently ignored the fact that the County's Personnel Law is "presumptively countywide in nature," and thus applies to them just as it does to any other County employee.  (*Id*.)  Furthermore, the County argues that it was under no obligation to negotiate with the Unions, because the EFP is a County-wide matter, and any exception permitted by County law under the County's Salary Plan is not applicable to this situation because "Section 16-229, which authorizes the furlough plan, [was] not authorized to be established under the County's Salary Plan." (Paper 8 at 16.)  Finally, the County insists that the Unions have not pointed to any provision of the collective bargaining agreements that are contrary to the furlough plan, and although the agreements

-17-

do provide annual salary scales, [and wage scales] they do not contain any provisions which exempt the Unions from the applicability of the furlough plan.[22]  (Paper 27 at 23-24.)

The Unions maintain that the County's assertion that the CBAs do not contain explicit language prohibiting furloughs is without merit.  They point to the "crucial, undisputed fact" that all but one of the CBAs in force guarantee paid work hours and these work-hour guarantees are "inconsistent with unpaid furloughs under Section 16-229."[23]  (Paper 24 at 8.)  The Unions cite *Prince George's County v. Fraternal Order of Police, Lodge No. 89*, for the proposition that Section 16-233 of the Personnel Law conveys any CBA, adopted and approved by legislative act, overriding authority over any contrary provisions found in the Personnel Law.  *See* 172 A.2d 295, 314 (Md. Ct. Spec. App. 2007).  The Unions remark that while the County acknowledges that "specific provisions of a CBA approved" by the Council "override" the Personnel Law, it "completely ignore[s] the work-hour provisions of the collective bargaining agreement that on their face are 'contrary' to the furlough provisions" of the Personnel Law.  (Paper 24 at 9.)  This dichotomy, the Unions declare, is untenable.

The Court finds the Unions arguments unpersuasive.  Section 16-233(e) is unique to Prince George's County.  To the Court's knowledge, no other jurisdiction in the State of Maryland has a similar provision in its personnel law, and only one case exists that addresses the operation of 16-233(e) in light of a "contrary provision" within a CBA.  *See FOP, Lodge No. 89*, 172 A.2d 295 (Md.

---

[22] In their response to the Public Safety Unions' Cross Motion for Summary Judgment, the County argues, for the first time, that Plaintiffs claims should be dismissed because they have not exhausted the "grievance-arbitration" procedures as outlined in the CBAs.  The Court does not believe that this matter concerns a "grievance" as contemplated by the CBAs because Plaintiffs claims do not involve an interpretation of the CBAs. This crux of this suit is also not considered an "adverse action" and thus is not under the purview of any County administrative agency.  *See* Section 16-102(26).

[23] The CBAs between the Deputy Sheriffs Association and the County do not contain an affirmative guarantee of paid work hours.  According to the Plaintiffs, the long-standing practice has been for the Sheriffs Office to operate under a work-hour guarantee of eighty (80) hours per pay period and guaranteed annual salaries.

Ct. Spec. App. 2007).  While the Maryland Court of Special Appeals unequivocally sanctioned the

"overriding impact of [Personnel Law Section] 16-233(e)" it did so in the context of a specific

provision contained within the CBA at issue.  *See id.* at 210.  In that case, Section 4.04 of the FOP's

CBA with the County *specifically* addressed promotion practices within the police department, and

the County law at issue directly dealt with promotion practices.  In confirming the arbitration award,

the Court of Special Appeals held that, "[i]n § 16-233(e) the County Council clearly mandated that

CBAs supersede the *general* provisions of the county personnel laws."  *Id.* at 211 (emphasis added).

         In addition, the Court finds the history of the CBAs between the parties particularly

informative on this issue.   From July 1991 until June 1995, the Public Safety Unions' CBAs

contained a specific provision against furloughs. (*See* Paper 15 Ex. 2.)   The provision stated, "no

employee covered by this Agreement will be furloughed or separated from employment as the result

of a reduction-in-force."  (*Id.*) Thereafter, for some reason, this provision no longer appeared in any

of the CBAs, rendering the CBAs silent on the issue of furloughs.  The Unions do not dispute this

fact, nor do they offer the Court any explanation of the impetus for the change. The Court finds the

CBAs' silence on the issue of furloughs significant and does not believe that the Unions can, in good

faith, argue that they bargained for an exemption from furloughs.  Consequently, the Court declines

to read the CBA in the broad sweeping manner advanced by the Unions.  Instead, the Court reads

Section 16-233(e) to mean that specific provisions, clearly contemplated and bargained for by the

parties, in a CBA override any parallel contrary general provisions in the County Personnel Law.

 The Court does not find that the general wage provisions or wage scales of the CBAs at issue

override general County Personnel Law, and therefore the Court grants summary judgment in favor

of the County as to Count I of the Public Safety Unions' complaint and Count 2 of the AFSCME

Unions' complaint.

B.       *Whether the EFP was "required" under Section 16-229 of the County Personnel Law*

Count II of the Public Safety Unions' complaint and Count I of the AFSCME Unions' complaint alleges that the County's furlough plan violates Section 16-229 of the Personnel Law because it is not "required."   Section 16-229 permits the imposition of a furlough plan "under any one (1) of the following circumstances:

> (1) Where the County Executive determines that an ascertained shortfall in revenue, based upon available projections, during any fiscal year requires the compensation level of a department, agency, or office to be reduced; or,

> (2) Where a reduction in the compensation level of a department, agency or office is effectuated in the County's approved annual expense budget; or,

> (3) Where an appointing authority requests, and the County Executive approves, furloughs for employees under the appointing authority's jurisdiction in order to meet the compensation level funded for the department, agency, or office in the County's approved annual expense budget.

(Paper 8 Ex. 25.)  Section 16-229 also outlines the steps the County Executive must follow in order to enact a furlough plan, provided that one of the above circumstances is met.  Section 16-229 mandates that:

> The County Executive shall transmit to the County Council a Furlough Plan, in resolution form, which sets forth,

> > (1) The circumstance warranting the furlough action;

> > (2) The number of employees to be affected by the furlough action identified by agency, salary, grade and salary schedule;

> > (3) The number of furlough days or hours an affected employees will be required to take;

> > (4) The period of time over which furlough days or hours will be required; and,

> > (5) The dollar amount of compensation savings expected to result from the Furlough Plan.

(*Id.*)

-20-

The parties agree that the first circumstance applies to the Furlough Plan.  In sum, the Unions say that the County has violated Section 16-229 because the Furlough Plan is hardly "required," given the undisputed existence of the County's reserve funds, and because the "ascertained shortfall in revenue" was not "newly discovered."[24]  (Paper 33 at 18.)  The Unions  point to both the GFOR and the UFB as "an alternative to furloughs . . . thereby exposing the Furlough Plan as neither required  nor  reasonable  and  necessary  under  the  governing  standards."    (Paper  24  at  19.)

The County contends that it did not violate Section 16-229 of the Personnel Law because "the County Executive properly exercised his discretion under Section 16-229, to transmit a Furlough Plan to the Council for approval, when he 'determined that an ascertained shortfall in revenue, based upon available projections, during any fiscal year requires the compensation level of a department, agency, or office to be reduced.'"  (Paper 27 at 28.)

The County also makes an additional, rather odd and seemingly contradictory argument.  The County maintains that it was not aware of the economic risks it faced, but they argue that the doctrine of unclean hands bars the AFSCME Unions from the equitable relief they seek from the Court because AFSCME "[knew] full well of the mortgage crisis that the County began to face in 2007 . . . ."  (Paper 41 at 15.)   The County insists that AFSCME knew the contents of the SAC report, the economic risks facing the County, and that the bubble was about to burst on the housing market, but yet chose to lobby for increases and to enter into new contract.  (*See id*.)  For these reasons, the County contends that AFSCME should be barred from any equitable relief because the County has met its burden and shown that "AFSCME knew that any increase in its COLAS or wages were  the  basis  of  its  bargain  with  the  County,  and  the  County  promised  to  pay  even  though

---

[24] The Unions agree that the County's fiscal situation does not constitute a "public emergency" within the meaning of Section 806, and, therefore, the County may not use any funds in the GFCR to close the budget gap.  Thus, the Unions refer only to the balances in the GFOR and the UFB when they argue that the Furlough Plan violates Section 16-229. (*See* Paper 24 at 20.)

AFSCME was aware of the contents of the report of the SAC and the negative economic indicators, not to mention the collapse of the County's residential real estate market." (*Id.*)

The Court is perplexed by this argument because the County seems to shift the responsibility of its fiscal management to the AFSCME Unions. Moreover, by arguing that AFSCME was well aware of the County's perilous financial situation when it entered into the CBA, the Court wonders whether the County is suggesting that it had no intention of performing its contractual obligations. The doctrine of unclean hands is a well-established doctrine that "assumes that the [party] asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence," and allows a court to decline to intervene on a party's behalf. *Mas v. Coca-Cola Co.*, 163 F.2d 505, 507-08 (4th Cir. 1947). In most cases, the unclean hands doctrine is applied to cases in which the cause of action has arisen out of or been the fruit of unconscionable conduct. *See id.* That is not the situation in this case.

Curiously, the County acknowledges that it promised to pay the AFSCME Unions but then points the finger at the AFSCME Unions because they were bold enough to ask for COLAS and other increases in the face of the County's fiscal challenges. What leaps out at the Court is that while shining the spotlight on what the AFSCME Unions supposedly knew, the County then straps on blinders for its own convenience. The Unions bear no fault for seeking higher pay for its members, which, as far as the Court is aware, is the standard practice of a Union: to advocate on behalf of its members. If the County is claiming that it knew it could not afford to pay the COLAS, the Court wonders why the County agreed to pay them in the first instance. At any rate, the Court summarily rejects this portion of the County's argument as to Section 16-229, and instead will address the County's first argument.

At the outset, the County argues that it did not violate Section 16-229 of the Personnel Law because "the County Executive properly exercised his *discretion* under Section 16-229, to transmit a Furlough Plan to the Council for approval." (Paper 27 at 28 (emphasis added).) The Unions'

response disregards the County Executive's discretion and attempts to hold the County Executive's decision-making authority under Section 16-229 to the same standard as that of the Contract Clause of the United States Constitution.  The County then follows the Unions' lead and melds its defense under Section 16-229 and the Contract Clause by saying that, the "County's Furlough Plan was both required under Section 16-229 and reasonable and necessary under the Contract Clause."  (Paper 28 at 2.) The Court does not consider the "required" standard of Section 16-229 and the "reasonable and necessary standard" of the Contract Clause as one in the same, and thus will address them separately.

Section 16-229 permits the County Executive to devise a furlough plan when, "[*he*] *determines* that an *ascertained shortfall in revenue*, *based upon available projections*, during any fiscal year *requires* the compensation level of a department, agency or office to be reduced.  (Paper 8 Ex. 25 (emphasis added).)  In accordance with well-established canons of statutory construction, the Court will give the undefined words of Section 16-229 their ordinary, contemporary and common meaning.  *See U.S. v. Lehman*, 225 F.3d 426, 428 (4th Cir. 2000).  The words of Section 16-229 grant the County Executive a wide latitude of discretion.  The language of the statute is unambiguous and clearly makes the decision of whether or not to implement a furlough plan, a subjective one.  The statute simply states that a furlough plan may be transmitted to the County Council when the County Executive *determines* that compensation levels are *required* to be reduced. No input is necessary from any other source, nor is there any limiting language on the word "required."  The AFSCME Unions argue that the ascertained shortfall in revenue was not "newly discovered," and therefore the furlough plan was not "required."  (Paper 33 at 18.)  Once again, this argument assumes an overlap with the "reasonable and necessary" standard of the Contract Clause, yet the statute is bereft of any language that permits the Court to find that such an overlap exists. The Unions also argue that "by using the term 'requires,' Section 16-229 plainly prevents the County from furloughing employees when the furlough is not necessary."  (Paper 12 at 29.)  The Court declines to find the word "requires" to be synonymous with the word "necessary."  The Court

finds that the power given to the County Executive under Section 16-229, while not without limit, is exceptionally broad, and absent a showing of bad faith or unreasonableness, the County executive has full authority under Section 16-229 to determine what is "required."  Moreover, the Unions have not provided the Court with any legislative history, case law or other comparable authority that contradicts this finding.  Thus, only a difference of opinion, but not a genuine dispute of material fact exists regarding Section 16-229.  The Court concludes that the County did not violate Section 16-229,  when it chose to implement a furlough plan to address the budget shortfall, and grants summary judgment in favor of the County as to Count 2 of the Public Safety Unions' complaint and Count I of the AFSCME Unions' complaint.

C.      *Whether the Furlough Plan violates the Contract Clause of the United States Constitution*

While the County Executive enjoys a great deal of discretion under the County's Personnel Law, the same cannot be said of his discretion under the more rigorous strictures of Article I, Section 10, Clause 1, of the United States Constitution.  The Contract Clause states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The Framers of the Constitution drafted the Contract Clause based on the concern that state governments might enact legislation to alter, relax or unilaterally modify contractual obligations.  Although the Contract Clause applies to private and public contracts alike, the Supreme Court has offered relatively little interpretation of it, in comparison to other portions of the U.S. Constitution.   But the extant interpretation of the Contract Clause by the Supreme Court, thus far, is clear that while "the Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations," legislation that impairs a State's own contracts is subject to much greater scrutiny than that which impacts the rights and obligations of private parties.  *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 25-26 (1977).  As a preliminary matter, it is undisputed that despite the Contract Clause, States retain a certain amount of power to safeguard the welfare of their citizens.

-24-

To pass constitutional muster, however, a State, or as in the present case, a County, when exercising this power, by enacting legislation that constitutes a substantial impairment of its own contracts, must demonstrate that the legislation is "reasonable and necessary to serve an important public purpose." *Id.* at 25.

A court's analysis under the Contract Clause requires a three-part inquiry. First, the Court must assess whether the legislation at issue, in fact, *impairs* a contract. *See id.* at 17. Second, given the finding of an impairment, the Court must determine whether said impairment constitutes a "*substantial* impairment of a contractual relationship." *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1015 (4th Cir. 1993)(emphasis in original). Third, assuming that the impairment is substantial, the Court must then determine whether the impairment is "nonetheless permissible as a legitimate exercise of the [County's] sovereign powers . . . ." *Id.*

The last financial crises experienced by the United States happened in the early 1990s, arguably as a result of the savings and loan crisis of the late 1980s. Thus, much of the most recent case law interpreting the Contract Clause with respect to the impairment of public contracts was generated during this period. *Baltimore Teachers Union v. Mayor & City Council of Baltimore*, is the only case of binding precedent somewhat similar to the case at bar. 6 F.3d 1012 (4th Cir. 1993)(two-judge panel).[25] In that case, the City of Baltimore enacted a salary reduction plan in the middle of the fiscal year, in response to budget cuts imposed by the State of Maryland. Like the County's, the City of Baltimore's fiscal year runs from the beginning of July until the end of June. In October 1991, well into FY 1992, the State of Maryland cut aid to the City of Baltimore by approximately $24.2 million. *See id.* at 1014. Like the County, the City of Baltimore was obligated

---

[25] The dissent in this case noted that "substantial authority, federal and state, . . . contradict[s] the opinion of the two-judge panel majority."

to maintain a balanced budget.  Therefore, when faced with these cuts, the City of Baltimore

implemented a variety of measures, such as layoffs, elimination of positions and early retirement,

to address the budget deficit.  *Id.*  These measures brought Baltimore City's budget back into

balance; however, the State of Maryland still faced fiscal difficulties.  In December 1991, the

Governor proposed another round of cuts in state aid to Baltimore City, of approximately $13.3

million.  *Id.*  In response to this second round of unexpected cuts,  Baltimore City devised and

implemented a furlough plan in order to balance its budget.  *Id.*  Under the plan, all full-time City

employees, except firefighters, "lost the annual equivalent of 2.5 days of pay, or .95% of their gross

annual salary."[26]  *Id.*  The plan saved the City of Baltimore approximately $2 million.  *See id.*  The

teachers and police sued the City of Baltimore claiming that, in light of the existing CBAs, the

furlough plan violated the Contract Clause.  *See id.*  Ultimately, for several reasons, the Fourth

Circuit found that while the City of Baltimore's furlough plan did substantially impair the CBAs it

had with the teachers and the police, "it was an impairment permitted by article I, section 10."  *Id.*

At 1022.  The Court shall follow the lead of the Fourth Circuit and begin its analysis with the

question of whether the County's EFP impairs the Unions' CBAs.

### 1.     *Contract Impairment*

        For the reasons set forth below, the Court finds that the EFP constitutes an impairment of the

Unions CBAs.  The Fourth Circuit in *Baltimore Teachers Union* found that the salary reduction plan

impaired the extant contractual relationship because the City of Baltimore voluntarily entered into

contractual relationship with its teachers and police, and the contractual relationship was enacted

into law by ordinance of the City Council.  *Id.* at 1015.  As a result of the furlough plan, the teachers

---

[26] Originally, the City of Baltimore's furlough plan proposed to reduce employees salaries by more than .95%, but the plan was discontinued midway when the General Assembly approved only $4.68 million of the $13.3 million in cuts proposed by the Governor.  *See Baltimore Teachers Union*, 6 F.3d at 1014.

and police unions "indisputably received less in salary than they were entitled to receive under the terms of their contracts," and the Fourth Circuit rejected the City of Baltimore's contention that the unions' contracts were subject to unilateral adjustment by the City.  *Id*. at 1015-16.  The same can be said here.  The County, without a doubt, voluntarily entered into a contractual relationship with the Unions, and each of the contracts were ratified by the County Council.  Under the contracts, covered employees were guaranteed certain salaries/wages and hours.  By furloughing employees, the County reduced these salaries/wages and hours.  The contracts were not subject to unilateral adjustment by the County.  To find otherwise would render the contracts virtually meaningless, because the union employees would not be able to "order their personal and business affairs" and rely upon the rights and obligations they bargained for.  *Id*. at 1017-18.  Thus, the Court finds that the EFP impaired the Unions' CBAs.  The Court next focuses on whether the impairment was substantial.  The Fourth Circuit dealt with this inquiry in short order, and this Court will follow suit.

### 2.        *Substantiality of the Impairment*

The Fourth Circuit remarked that Supreme Court has provided little guidance for determining whether an impairment is substantial, but concluded that "where the right abridged was one that induced the parties to contract in the first place," a court can assume the impairment to be substantial.  *Id*. at 1017 (citing *City of El Paso v. Simmons*, 379 U.S. 497, 514 (1965)).  Certainly, "in the employment context, . . . no right . . . [is] more central to the contract's inducement . . . than the right to compensation at the contractually specified level."  *Baltimore Teachers Union*, 6 F.3d at 1018.  The County appears to suggest that the EFP has had no effect on the parties' contractual relationship, because "all compensation rates were processed accordingly, including but not limited to COLAS, merits, allowance payments for work uniforms, tools, lump-sum [sic] special pay, and other new compensation schedule to occur or change after June 30, 2008."  (Paper 8 at 5.)  The

Unions bargained for their various compensation levels and the County ratified them.  But the EFP, as implemented, abridged the compensation for which the union employees bargained.  Every employee subject to the EFP has lost eighty (80) hours of pay,  totaling of 3.85% of their salaries, and the County was able to recoup $20 million as a result.  By contrast, in *Baltimore Teachers Unions*, the  City of Baltimore imposed an annual salary reduction of .95% on its employees, but the Fourth Circuit expressly rejected the City's  assertion that this amount was insubstantial. *Baltimore Teachers Union*, 6 F.3d at 1018 n. 8.  Thus, the Court finds that the EFP substantially impaired the Unions' contracts with the County.  The Court now turns to the third inquiry required under the Contract Clause – the reasonable and necessary determination.

### 3.      Impairment – Reasonable and Necessary?

The Supreme Court has declared that a substantial impairment "may be constitutional if it is reasonable and necessary to serve an important public purpose."  *United States Trust*, 431 U.S. at 25.  Public contracts "stand on somewhat different footing" than private contracts because "the State's self-interest is at stake."  *Baltimore Teachers Union*, 6 F.3d at 1019.  Given this special status, when assessing the reasonableness and necessity of an impairment, the Court must examine the impairment more scrupulously.  *See id.*  (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 n.15 (1978)).  Courts agree that "'complete deference' to legislative assessments of the reasonableness and necessity for modifying public contracts is not appropriate."  *Baltimore Teachers Union*, 6 F.3d at 1019 (citing *United States Trust*, 431 U.S. at 26); *see also Carlstrom v. State of Washington*, 694 P.2d 1, 4 (Wash. 1985).  A court's task is to "ensure . . . that states neither 'consider impairing the obligations of their own contract on a par with other policy alternatives or impose a more drastic impairment when an evident more moderate course would serve its purposes equally well, nor act unreasonably in light of the surrounding circumstances.'" *Baltimore Teachers*

*Union*, 6 F.3d at 1020.  (citing *United States Trust*, 431 U.S. at 30-31.)  The majority in *Baltimore Teachers Union* loosened the reins a bit, and determined that "at least some deference to legislative policy decisions to modify [the] contracts in the public interest must be accorded."  *Baltimore Teachers Union*, 6 F.3d at 1019.  The Fourth Circuit afforded a cautious amount of deference to the City of Baltimore's legislature and concluded that the "impairment was in exercise of the City's legitimate power and thus permissible under the Contract Clause."[27]  *Baltimore Teachers Union*, 6 F.3d at 1015.

The following three reasons factored into the Fourth Circuit's determination.  First, the Court found that the "amount of the reduction was no greater than that necessary to meet the anticipated shortfall."  *Id*.  Second, the Fourth Circuit noted that "the city discontinued the plan immediately upon recognition that the budgetary shortfall would not be so great as anticipated."  *Id*. (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 418 (1983)).  Third, "the plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay or the orientation of pay scales."  *Baltimore Teachers Union*, 6 F.3d at 1020.   For these reasons, the Fourth Circuit determined that the plan was reasonable under the circumstances because it was narrowly tailored to meet the City's unforeseen shortfalls, and "the plan was less drastic than at least one alternative, additional layoffs, which could have been more detrimental to appellees."  *Id*.

    i.    *Reasonableness*

---

[27] Due to the widespread financial crisis of the 1990s several similar lawsuits were filed by unions in response to salary reduction plans.  The Fourth Circuit was the only court that found the salary reduction plan at issue reasonable and necessary.  As a result the Fourth Circuit received a fair amount of criticism for its decision.  *See Massachusetts Community College,* 649 N.E.2d 708, 714 (Mass. 1995); *Note, Baltimore Teachers Union v. Mayor of Baltimore: Does the Contract Clause Have Any Vitality in the Fourth Circuit?,* 72 N.C. L. Rev. 1633 (1994); *Note, Fourth Circuit Upholds City's Payroll Reduction Plan as a Reasonable and Necessary Impairment of the Public Contract*, 107 Harv. L. Rev. 949 (1994).

First, the County contends that its actions were reasonable and necessary to further the important public purpose of protecting the "financial integrity of the County for the taxpayers and citizens."  (Seeman Depo. at 55) It claims that the reasonable and necessary inquiry is satisfied because the plan, "requiring 80 hours from each employee compensated through the general fund, [was] no greater than that necessary to meet $20 million revenue shortfall."  (Paper 27 at 36.)   The County states that its shortfall totaled $57 million, and it chose to address $20 million, or approximately one-third of the shortfall, through the EFP.  Why the County determined that one-third of the shortfall should be absorbed by the Unions is unclear, and thus a question remains as to whether this amount was "no greater than necessary to meet the anticipated shortfall." *Baltimore Teachers Union*, 6 F.3d at 1020.  The Court does find significant, the County's repeated assertion that, "had the employees agreed to give up their COLAS, we would not be sitting here today.  There would not have been a furlough had the employees given up their COLAS."  (Seeman Depo. at 54 and Paper 8 at 13.)   In light of these statements, the Court has reservations as to whether the County's fiscal crisis was the primary motivation for the furloughs or that the amount chosen by the County to recoup from the Unions was only that necessary to address the shortfall.  The Court is convinced, however, that the Unions were under no obligation to give up their COLAS or merit increases, but the County was, indeed, under an obligation to perform under the CBAs.  By presenting the Unions with its financial crisis on the eve of the new fiscal year, the County gave the Unions very little time to assess whether to give up their COLAS.  When the Unions rejected the County's request that they forgo their COLAS, the County proceeded to off-set the effect of the COLAS by enacting the EFP.

Second, the Fourth Circuit determined that the City's decision to implement the salary reduction plan was a measured response to a real problem because the City of Baltimore

discontinued the plan "immediately upon recognition that the budgetary shortfall would not be so great as anticipated." *Baltimore Teachers Union*, 6 F.3d at 1020.   In the case at bar, the County, at the June 26, 2008 meeting, presented the Unions with its economic data.  The data claimed that by the end of June, 2008, the County's UFB would total only $16 million and the County's budget, as a whole, would be negative $48 million.  (Paper 48 Ex. 4.)   Upon these assertions, the County requested that the Unions give up their COLAS and merit increases, totaling $13 million to help address the shortfall.  (Paper 48 Ex. 4.)

In September, 2008, the County revised its revenue estimates and projected the FY 2009 deficit to be $57 million, instead of $48 million, but the County also admittedly determined that the actual number for the UFB as of June 30, 2008, was not $16 million, but rather $65 million.  Despite the estimates being better than previously predicted, the County went ahead and implemented the EFP.  Thus, the County chose to impair its own contractual obligations even though the new calculations presented a picture better than that which was presented in June, and even though the County had considerably more resources at its disposal. Moreover, despite the new calculations, the County *increased* the amount it sought to recoup from the Unions from $13 million to $20 million. The Court does not question that the County faced a deficit, but what remains unclear in light of the fluctuating figures is the extent of the problem the County sought to address.  Finally, although the County's "plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay or the orientation of pay scales," the Court nevertheless finds that the EFP was not reasonable in light of the surrounding circumstances, because it was not a narrowly tailored response to a real problem and as the Court will discuss in more detail below, the Court has reservations about whether the shortfalls were "unforeseen." *Baltimore Teachers Union*, 6 F.3d at 1020.

> ii.     *Necessity*

With respect to the necessary component of the inquiry, in reaching its decision in *Baltimore Teachers Union*, the Fourth Circuit heavily relied upon the particular circumstances surrounding the salary reduction plan.  The court determined that,

> In light of the <u>magnitude and timing </u>of the proposed cuts in state funding that prompted the City's salary reduction, the undisputed need to balance its budget, the City's concerted <u>efforts to exhaust numerous alternative </u>courses of cost reduction before resorting to challenged reductions, the <u>circumscribed nature of the furlough plan</u>, and the City's abandonment of the reductions at the first opportunity, . . . [the] plan was, as it must be, "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption."

*Id*. at 1022 (quoting *United States Trust*, 431 U.S. at 22)(emphasis added).

The facts of the present case, relevant to the necessary inquiry are, in many ways, quite different than those in *Baltimore Teachers Union*, and although the Court's ultimate determination differs from that of the Fourth Circuit, the Court will follow the Fourth Circuit's lead and balance the public purpose to be fulfilled against: (1) the magnitude and timing of the events which prompted the furlough plan; (2) the County's efforts to exhaust numerous alternatives before resorting to the EFP; and (3) the breadth of the EFP.

The County claims that the furlough plan is necessary in light of the County's mandate to balance its budget and its revenue shortfall.  (Paper 27 at 35.) Plaintiffs respond, of course, that the EFP is not necessary because the County had over $230 million in reserves at its disposal to offset the shortfall and chose not to draw down from the reserves only to protect its AAA bond rating. (*See* Paper 24 at 17 and Paper 48 at 1.)

### a.    Magnitude and Timing

The County maintains that the impairment was reasonable and necessary because the County was facing an enormous deficit, and by law, it had to balance its budget, and took measured steps

to do so.  (Paper 8 at 29.)  None of the parties dispute the $95 million deficit the County faced before the County Council approved the budget.  Nor do the parties dispute the measures taken by the County to close this gap.  The County Executive submitted a proposed balanced budget to the County Council on March 14, 2008, and when he did, he acknowledged the tough times facing the County and the risks of further economic deterioration facing the County as highlighted by the SAC. (Paper 8 Ex. 14.)  Yet, the County Executive's POB, totaling $4.4 million more than what the SAC recommended, appears to not to have heeded the SAC's warnings.  (*Id.*) When questioned about this discrepancy, Mr. Seeman stated that the recommendations of the SAC are just that, recommendations, and the County is not beholden to those recommendations. (*See* Seeman Depo. at 117.) The County also presented a picture of fiscal stability to the rating agencies in May, 2008, and when the rating agencies gave the County the AAA rating, the County boasted about its "ability to maintain growth and prosperity during tough economic times."  (Paper 12 Bartholomew Aff. Ex. A.)  At the end of June, 2008, only a few weeks after these remarks, the County called an emergency meeting with the Unions to discuss the County's dire financial situation and $48 million revenue shortfall.  Then, only a few months later, in defense of the EFP due to a $57 million shortfall, the County characterized its financial stability as "quite volatile."[28]  (Paper 8 at 12.)  Furthermore, when deposed, Mr. Seeman also acknowledged that in its FY 2009 budget, the County set aside $5 million for real estate purchases, and another $3 million for equipment purchases.  (Seeman Depo. at 47-48.) The County was not under any contractual obligation to pay these monies, but simply set the money aside for desired purchases.  (*Id.*)

---

[28] Paper 8 was filed on September 29, 2008, only a few weeks after the litigation began and only a few months after the County declared its fiscal stability.

All of these facts, together, create a less than clear picture for the Court of the financial crisis the County actually faced.  To be clear, the Court does not question the severity of the current economic crisis, but rather questions the basis upon which the County, in September, 2008, made the decision to enact a furlough plan, and breach its contractual obligations. Although the Court will stop short of drawing any conclusions, the varying calculations presented by the County to the Unions, and reflected in the record, raise significant questions about either the County's accounting practices or the accuracy of the calculations themselves.  Mr. Seeman insists that the County, just like other jurisdictions, does not reproject revenues while the budget is before the County Council, and therefore "from January until May, 2008 the revenue projections" remained the same. (Seeman Depo. at 99, 130.) While this practice may be consistent with normal accounting practices, the County was certainly aware that this was not a normal budgeting year.  Thus, given the "huge fiscal challenges" faced by the County, and the problems and risks outlined by the SAC report, it would seem that wise fiscal policy would dictate that the County reproject its numbers more often.  (Paper 8 Ex. 14.)  With respect to the timing of the events which prompted the furlough, the Court, again finds the County's position unpersuasive.  The question of timing is significant given the Fourth Circuit's treatment of the issue in *Baltimore Teachers Union*.  There, the Fourth Circuit found that the City of Baltimore's actions were necessary, because the City enacted the salary reduction plan in response to cuts in funding proposed by the State at "the eleventh-hour," and the City was "already suffering from the sluggish economy and poor financial management."[29]  *Baltimore Teachers Union*, 6 F.3d at 1020.  Also significant was the fact that the "City, prior to implementation of the furlough plan, 'was approaching the point where it had to begin cutting basic services and

---

[29] Although the State of Maryland had cut funding to the County by $53 million, those cuts were accounted for in the County Executive's POB.

initiating the breakdown of government.'" *Id*. at 1021 (quoting Appellant's Br. at 21). The facts

here are quite different.

As far back as January 1, 2008, the SAC warned the County of the economic slowdown and

the vulnerability of the County's revenue stream. (Paper 33 Ex. B.) In February, 2008, additional

warnings were given to the County Executive and the County Council by the Director of Housing

and Community Development, Thommie Thompson. He characterized the County's housing crisis

as "alarming," and stated that, "Prince George's County had the State's highest number of

foreclosure events . . . in the second quarter of 2007." (Paper 33 Ex. C.) Furthermore, the County

Executive himself forecasted that the County's "General Fund Revenue [would] slow down

dramatically," due to the significant decrease in property and recordation taxes the County received.

(Paper 8 Ex. 14.) Yet, the County Executive proposed, and the County Council approved the FY

2009 budget, which was over $44 million more than what the SAC recommended. The County now

argues that the AFSCME Unions "knew full well of the mortgage crisis that the County began to

face in 2007", and that the "bubble was about to burst on the housing market." (Paper 41 at 15.)

This statement raises two unsettling issues. First, it suggests that the County's crisis can actually

be documented as far back as 2007, and second it calls into question the County's claim — that its

revenue shortfall was unexpected. Thus, the Court finds that neither the magnitude nor the timing

of the events which prompted the County's furlough plan approach the severity of those present in

*Baltimore Teachers Union*.

b.      *Efforts to Exhaust Other Alternatives*

Whether the County exhausted other alternatives is important because, the majority in

*Baltimore Teachers Union* found in favor of the City of Baltimore because the City decided to

furlough "only when it concluded that it had no better alternatives . . . ." *Baltimore Teachers Union*, 6 F.3d at 1020.  Before implementing the furlough, the City of Baltimore, among other things, considered closing its schools for a week.  *See id*. at 1022.  This idea was ultimately rejected, but it nevertheless demonstrated the exceptional circumstances that the City of Baltimore faced.  In light of the various other circumstances surrounding the Baltimore's furlough plan, e.g., the eleventh-hour nature of the cuts, the fact that the City had already laid off a portion of its employees, and the impending breakdown of government, *Id*. at 1021 (*See* Appellant's Br. at 21), the Fourth Circuit rejected the notion that the City was doing that which was "politically expedient." *See United States Trust*, 431 U.S. at 26; *see also Ass'n of Surrogates & Supreme Court Reporters*, 940 F.2d 766, 773 (1991).

Here, although the County suggests to the Court that it faced dire circumstances and had no other reasonable alternatives, the record suggests otherwise and the County's actions resemble trappings of doing that which was "politically expedient." *See United States Trust*, 431 U.S. at 26. The County concedes that when it adopted the EFP, it had approximately $230 million in reserves. (Paper 8 Ex. 18.) The GFCR totaled approximately $133 million, the GFOR totaled approximately $53 million and the UFB totaled approximately $44 million.  (*Id*.)  Although the GFCR is controlled by Section 806 of the County Charter, and may only be appropriated, in accordance with Section 816,  the other two funds do not have any restrictions attached to them.  As described by the County, the purpose of the GFOR is to "ensure a reasonable degree of stability in its programs over the long run," and it "can be used to offset the impact of budget emergencies or as a funding source for expenditures that the County Executive and County Council determine would benefit the citizens of Prince George's County." (Paper 48 Ex. 3.)  According to the County, the UFB is an unrestricted fund "used to mitigate the impact of the declining housing market and the accompanied dramatic

slowdown of the revenue growth within the County."     Therefore, based on the County's own descriptions of the reserve funds, the Court finds that, approximately $97 million was at the County's disposal, as the County contemplated implementing a furlough plan.  Nothing in the facts recited by the Fourth Circuit in *Baltimore Teachers Union* suggest that the City of Baltimore had similar funds at its disposal, and, thus, although the Court's determination does not rest solely on the existence of these funds, the Court does find their availability significant.

The County claims that it resorted to the furlough plan to protect the "fiscal integrity" of the County, and that it chose not use any reserve funds to address the shortfall because wise fiscal policy dictates that reserve funds only be used for "one-time," as opposed to "on-going" expenditures. (Seeman Depo. at 43.)  The County describes "one-time" expenditures as "expenditures that are not recurring," such as "capital projects," and on-going expenditures as "people's salaries . . . and fringe benefits. . . ."  (*Id*.)   While the County repeatedly stated that as a matter of policy it chose not to draw down on the reserve funds because it is not the County's practice to use fund balance for on-going expenditures,  the County also stated that the furlough for FY 2009 was a "one-time savings." (*Id*. at 44-45.)   Moreover, Mr. Seeman conceded that each year the County, "as a general matter of policy," designates a portion of the UFB for the following year to "*either* to balance the budget or pay for specific one-time expenditures."[30]  (*Id*. at 63.)    Mr. Seeman also made the rather equivocal remark  that "you don't use [reserve funds] for ongoing expenditures *unless* you absolutely have to . . . ."  (*Id*. at 43.)(emphasis added.)   Mr. Seeman acknowledged that the UFB is unrestricted but then claimed the funds may be spent, "if the County were to *choose* to spend [it]," (*Id*. at 50.) and that "a policy judgment" was made not to use the funds.  (*Id*. at 104.) Thus, the use of fund balances

---

[30] Ordinarily, approximately $27 million is set aside each year.  (Seeman Depo. at 42.)

was one viable alternative, but it seems that the County's reasons for not using any of its reserves are vague and designed to suit its own obscure needs.

Unlike County Personnel Section 16-229, the Contract Clause of the United States Constitution does not afford the County such wide discretionary latitude. The County is not free to pick and choose whether to impair its own financial obligations in order to remedy its financial woes, and to be clear, the County's decision was not born out of a lack of appreciation for high value placed on contracts. Quite the contrary, the County demonstrated its appreciation of the importance of contracts when it acknowledged that "[they] were bound by an agreement with the State of Maryland" and therefore could not implement any budget cuts for Prince George's County Hospital. (*Id*. at 17.) The County appears to have preconceived notions about the lines it will and will not cross in order to accomplish its objectives.

Second, after the County revised its FY 2009 budget to address the $57 million shortfall, line items for real estate and equipment purchases totaling $8 million remained. (Seeman Depo. at 47.) When asked whether the County was contractually committed to pay these monies, Mr. Seeman said, "there is no contract," and when probed whether the County could have pulled those monies back, Mr. Seeman responded, "that's possible." (*Id*.) These facts suggest that the County was not approaching a break point similar to that of Baltimore City. Thus, a second alternative was at the County's disposal.

In the narrative the County Executive submitted to the County Council with the POB, a third alternative was laid on the table by the County Executive. He stated that "further reduction to Community College and other County aid [were] possible," should the budget gap become greater than anticipated, (Paper 8 Ex. 14.) but yet when asked whether the County decreased funding to the

Community College before it implemented the EFP, Mr. Seeman stated, "no, we didn't decide to cut them." (Seeman Depo. at 17.) The County also acknowledged that the Park Commission had a fund balance of between $60 and $80 million. (*Id*. at 26.) Mr. Seeman was asked whether he considered accessing some of that money in lieu of implementing the furloughs. Mr. Seeman responded in the negative and stated, "you have to get agreement from Park and Planning to use that money. We can't take the money from Park and Planning unless they agree to it." (Seeman Depo. at 28.) Despite the County's position, the Court considers this a fourth alternative.

Finally, the Unions suggest that the County's decision to furlough, instead of drawing down from its reserves, was driven by something other than protecting County citizens. On June 3, 2008, for the first time ever, the County received the highest possible bond rating from Standard & Poor's. When County officials met with the rating agencies in May, 2008, they were aware that the ability to maintain the County's fund reserves was of concern to the rating agencies, and as a result the County officials expressed that they would "take whatever action necessary" to "maintain [the County's] reserves." (Seeman Depo. at 146-47.) When it received the rating, the County boasted about its "strong financial leadership, and [its] ability to maintain growth and prosperity during tough economic times." (Paper 12 Bartholomew Aff. Ex. A.) The same week, the County issued $110 million in general obligation bonds, and estimated that the UFB would total $70 million as of the end of June 2008. (Seeman Depo. At 95.) Within a very short time after the AAA rating was issued, after not looking at its revenue estimates for "four to six months," the County decided to do some projections and found "they were dramatically worse than what was in the proposed budget." (Seeman Depo. at 100.) On June 26, 2008, the County told the Unions that the UFB would be $16 million, by the end of June 2008, instead of the $35 million it previously projected in the POB. (*See id*.) At the beginning of September 2008, when the County was faced with an increased deficit, it

discovered that the actual undesignated fund balance was $65 million as of June 30, 2008.  (*See id.* at 106.)  The Unions maintain that the County remembered that it told the rating agencies that it had "maintained its reserves," and it was "willing to take strong action . . . including things like furloughs" to reduce its expenditures, and that is why it made the decision to furlough.

The County contends, however, that it "made a policy decision not to do layoffs" because layoffs are "more permanent [and the County Executive determined that layoffs] would [have been] far more onerous."  (Seeman Depo. at 103)  The Court declines to give any opinion concerning what may or may not have motivated the County to choose to furlough, and the Court certainly appreciates the County's inclination to avoid lay-offs, given the difficult economic times of our nation and the impact it has had on our communities.  But the County's actions cannot run afoul of the Contract Clause.  If the Contract Clause is to mean anything, the County cannot "consider impairing the obligations of its own contracts on a par with other policy alternatives."  *Baltimore Teachers Union*, 6 F.3d at 1020 (quoting *United States Trust,* 431 U.S. at 30-31).

The Court will not instruct the County how to conduct its fiscal affairs, but the Court believes that the County had several other, more moderate alternatives that would have served its purposes equally well.  *See Univ. of Hawaii Prof. Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1993)(citing *United States Trust*, 431 U.S. at 31).  Perhaps the County could have taken small portions from a variety of sources, or eliminated non-contractual expenditures, or cut the budget of the Community College, or from the beginning heeded the warnings from the SAC and planned its budget to address potential shortfalls, or as it did in years past, balance the budget using monies from the UFB.  The choice of which revenue-saving measure the County selected is outside the Court's purview, however the "menu of alternatives does not include impairing contract rights to obtain forced loans to the [County] from its employees."  *Condell v. Bress*, 983 F.2d 415, 419-20 (2d Cir.

1993).  "Although perhaps politically more difficult," or embarrassing, the Court finds that

"numerous other alternatives" were within the County's reach.  *Cayetano*, 183 F.3d at 1107.

      *c.*     *Breadth of the EFP*

Lastly, the Fourth Circuit focused on the extent of the impairment in *Baltimore Teachers Union* because it found the fact that the City of Baltimore halted the salary reductions as soon as cuts from the State were not as deep, significant to the reasonable and necessary inquiry.  Here, the EFP required 5,900 employees to take eighty (80) unpaid hours during FY 2009, effectively cutting the annual salaries of all covered employees by 3.85%.  (Paper 8 at 2.) The EFP was never halted at any time in FY 2009, and to the Court's knowledge, most, if not all employees covered by the furlough have taken their requisite hours of unpaid time.[31]  Thus, again, the facts here are quite different than those in *Baltimore Teachers Union*, and in light of the Court's discussion of the County's effort to exhaust other alternatives, the Court finds that the breadth of the EFP was not reasonable or necessary under the Contract Clause.

## IV.    Conclusion

The Court is ever mindful of the present state of our economy.  Indeed, many state and local governments have experienced and will continue to experience drastic revenue shortfalls.  The Court further recognizes that Prince George's County, like other counties and municipalities, is struggling with budget deficits and is searching for alternatives to layoffs in the midst of a global recession. While adequate deference must be accorded to the fiscal decisions of government officials, the Court

---

[31] The Court is aware that the County is possibly planning to implement additional furloughs in FY 2010.  The Court's opinion here is limited to the furlough plan for FY 2009.

cannot merely give lip service to the fundamental principles that undergird the Contract Clause of the United States Constitution.  To do otherwise, even in these severe economic times, would sanction the County running roughshod over the Unions, who in good faith negotiated a binding contract with the County.  The Court finds that the County's actions, while permissible under County Personnel Law, violate the Contract Clause of the United States Constitution.

While the Court intends its holding to be clear, it cautions that the holding ought not be read to extend beyond the unique factual circumstances of this case.  As previously stated, "at least some deference to legislative policy decisions to modify . . . contracts in the public interest must be accorded," thus depending on the circumstances, the County may be authorized to take any and all steps it perceives as reasonable and necessary to close budget gaps, including but not limited to furloughs.  *Baltimore Teachers Union*, 6 F.3d at 1019.   Moreover, furloughs have occurred nationally in both the public and private sector, and in light of the economic forecast, furloughs are likely to continue.  This Court's holding is not a pronouncement regarding furloughs in general, but rather applies to the narrow issue of the legality of the  EFP as proposed by the Prince George's County Executive and approved by the County Council on September 16, 2008.

In sum, the Court finds that when the County implemented the EFP it did not violate Section 16-233(e) of the County Personnel Law because the general wage provisions of the CBAs do not supercede general provisions of County Personnel Law.  The Court further finds that the EFP is valid under Section 16-229 because the County Executive has significant discretion under Section 16-229 to determine what is "required."  Finally, the Court holds that the FY 2009 EFP violated the Contract Clause because the County exceeded its discretion and chose to substantially impair its contractual obligations to address an arguably foreseeable budget shortfall when, in light of the

surrounding circumstances, other more moderate alternatives would have served its purposes equally well.

For the reasons stated above, the Court will grant the County's Motion for Summary Judgment as to Count I and Count II of the Plaintiffs' complaint and will deny the County's Motion as to Count III.    The Court will grant the Plaintiffs' Cross Motion for Summary Judgment as to Count III of their complaints and deny it as to Counts I and II.  The FY 2009 EFP has run its course.  Thus, the Plaintiffs' request for injunctive relief is now moot.  The Court hereby declares that the FY 2009 EFP violated the United States Constitution.  An Order consistent with this opinion will follow.

   August 18, 2009                                      /s/
          Date                                     Alexander Williams, Jr.
                                             United States District Judge